```
 1                  UNITED STATES DISTRICT COURT

 2                WESTERN DISTRICT OF NEW YORK

 3

 4     - - - - - - - - - - - - - X
       UNITED STATES OF AMERICA      )
 5                                   )
       vs.
 6                                        Rochester, New York
       SCOTT BARNES,                 )  December 18, 2023
 7                    Defendants.         3:30 p.m.
       - - - - - - - - - - - - - X
 8     DETENTION HEARING

 9

10                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE ELIZABETH A. WOLFORD
11                UNITED STATES DISTRICT JUDGE

12
                        TRINI E. ROSS, ESQ.
13                      United States Attorney
                        BY: JOSEPH M. TRIPI, ESQ.
14                          NICHOLAS COOPER, ESQ.
                            CASEY L CHALBECK, ESQ.
15                      Assistant United States Attorneys
                        138 Delaware Avenue
16                      Buffalo, New York 14202

17
                        DAVID B. COTTER, ESQ.
18                      380 Cleveland Drive
                        Buffalo, New York 14215
19

20                      T. Zeller, USPO
                        K. Nenni, USPO
21

22

23

24     COURT REPORTER: Karen J. Clark, Official Court Reporter
                        Karenclark1013@AOL.com
25                      100 State Street
                        Rochester, New York 14614
```

```
 1                    USA V. S. BARNES

 2

                    P R O C E E D I N G
 3              *              *              *

 4

 5              THE CLERK:  We're on the record in the

 6    matter of the United States versus Barnes, 23MR551.

 7              THE COURT:  Good afternoon, everybody.  Why

 8    don't we first have appearances for the record?

 9              MR. COOPER:  Sure.  For the United States,

10    Nicholas Cooper, Joseph Tripi, Casey Chalbeck and our

11    paralegal Karen Champoux.  Good afternoon.

12              THE COURT:  And on behalf of the defendant?

13              MR. COTTER:  David B. Cotter on behalf of

14    Scott Barnes.

15              THE COURT:  And are you Scott Barnes?

16              THE DEFENDANT:  Yes, ma'am.

17              THE COURT:  And you can stay seated.  Are

18    you represented by Mr. Cotter?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Mr. Barnes, I'm the district

21    judge that has been assigned to the appeal, at least, to

22    the Magistrate Judge's determination and Officer Nenni.

23              PROBATION:  Yes, your Honor.

24              THE COURT:  And Officer Zeller is here from

25    probation.  I appreciate that you're appearing on behalf
```

                    USA V. S. BARNES

1    the Buffalo probation officer who prepared the bail

2    report.  But let me ask probation this question, and if

3    you don't know the answer to the question, if you could

4    find out before the end of this, has probation's opinion

5    or recommendation changed at all with respect to the

6    defendant's release?

7           PROBATION:  No, it has not, your Honor.

8           THE COURT:  Okay, thank you.  So we're here

9    for an appeal by the government of Judge Schroeder's

10   decision to release the defendant subject to conditions.

11          So go ahead, Mr. Cooper.

12          MR. COOPER:  Thank you, Judge.  So, first of

13   all, we provided some exhibits to defense counsel and to

14   Magistrate Judge Schroeder.

15          THE COURT:  I haven't -- I saw an e-mail

16   that Mr. Tripi sent to Judge Schroeder's Chambers, which

17   appeared to be exhibits that were used during Mr.

18   Ermin's detention hearing, but I don't think I've seen

19   anything specific to Mr. Barnes.  I've read the

20   transcript of the appearance concerning Mr. Barnes.

21   I've read the Criminal Complaint and I've read the bail

22   report, but I think that is pretty much the extent of

23   what I have.  And then I guess I have your appeal and

24   then I also have Mr. Cotter's motion that was filed with

```
 1                    USA V. S. BARNES
 2   respect to personal property and we'll address that
 3   today.
 4              MR. COOPER:  Yes, Judge.  So with respect to
 5   the exhibits, Mr. Ermin's detention hearing was run
 6   immediately before Mr. Barnes' detention hearing.
 7              THE COURT:  And I should be clear, I've read
 8   both transcripts.
 9              MR. COOPER:  Yes, Judge.  And so at the
10   beginning --
11              THE COURT:  I don't mean to interrupt you
12   again, but the transcript involving Mr. Barnes says that
13   it was in front of Judge McCarthy, but that, obviously,
14   was incorrect.
15              MR. COOPER:  No, that is not correct.  They
16   were both back to back in front of Judge Schroeder.
17              THE COURT:  You should communicate with the
18   court reporter about fixing the cover page.
19              MR. COOPER:  Yes, Judge.  We'll make a note
20   of that.  With respect to that transcript of Mr.
21   Barnes's detention hearing, the Court will note that at
22   the beginning of that proceeding the government
23   indicated that Mr. Cotter and Judge Schroeder had both
24   been present for the Government's proffer and for the
25   exhibits introduced for Mr. Ermin's detention hearing,
```

```
                         USA V. S. BARNES
```

1                    USA V. S. BARNES

2    and so we asked, in order to conserve some time that

3    afternoon, to incorporate by reference the exhibits and

4    the proffer by AUSA Tripi for Mr. Ermin's detention

5    proceeding and so that was considered by Judge Schroeder

6    and I have a binder containing all of the exhibits for

7    the court today and Mr. Cotter has had them since last

8    week.  May I hand it up?

9            THE COURT:  Yes.  Thank you.  Go ahead.

10            MR. COOPER:  So the bases that the

11    government is moving for detention, there are several,

12    and then there is one in particular that I would like to

13    focus on more today.  First of all, because 922(g) is

14    determined to be a crime of violence for the purposes of

15    the Bail Reform Act, consistent with the United States

16    v. Watkins in the Second Circuit, the government

17    believes that 3141(f)(1)(A) applies.  Also,

18    3142(f)(1)(E) makes this a detention eligible case

19    because it's any felony that is not otherwise a crime of

20    violence that involves the possession or use of a

21    firearm.  Under 3142(f)(2)(A), there is a serious risk

22    that this defendant will flee.  And, finally, under

23    3142(f)(2)(B), a serious risk that such person will

24    obstruct or attempt to obstruct justice or threaten,

25    injure or intimidate a prospective witness or juror.

```
 1                    USA V. S. BARNES
 2              THE COURT:  What proof do you have of that?
 3              MR. COOPER:  So, Judge, those last two are
 4    --
 5              THE COURT:  My question is related to the
 6    obstruction of justice, because I've read the detention
 7    hearing transcript and I don't think there is any
 8    dispute that the Outlaw Motorcycle Club promotes in
 9    writing the idea that they don't like snitches or people
10    that cooperate with law enforcement.  But what evidence
11    do you have that this particular defendant would present
12    a serious risk of obstruction of justice?
13              MR. COOPER:  So, Judge, the Outlaws
14    Motorcycle Club does more than just promote, in its
15    writing, as an organization first --
16              THE COURT:  Look it, you don't have to spend
17    a lot of time on the Outlaws Motorcycle Club.  I read
18    the transcript.  I sat through a trial that lasted four
19    months that dealt with a motorcycle club, and the
20    Outlaws Motorcycle Club came up not infrequently during
21    that trial, but you need more than just having
22    membership in an organization to be able to suggest that
23    this defendant presents a serious risk of obstruction of
24    justice.  So I want to know what evidence you have about
25    this defendant presenting a serious risk of obstruction
```

                    USA V. S. BARNES

of justice.

          MR. COOPER:  Yes, Judge.  So in the
detention hearing before Judge Schroeder, the government
proffered about this defendant individually, his status
within that organization, and I think that is pertinent
to this question.

          THE COURT:  It is because, obviously, the
government can proceed by proffer in a detention
hearing, that is totally fine, and it's been endorsed by
the Second Circuit.  But the judge who is presiding over
the detention hearing has an obligation to make an
assessment about the reliability of the evidence, even
if it's by proffer.  And so you just standing up and
telling me, this guy is part of the bat group or
whatever they are called or a national enforcer, I need
more than you just telling me that.  What are you basing
those statements on?

          MR. COOPER:  Your Honor, I spoke over the
weekend, actually, with an ATF, I believe his title
would be intelligence analyst, named Jeremy Sheets, and
that person has been proffered and accepted by district
courts across the country as an expert in outlaw
motorcycle gangs.  To be clear, outlaw generally, not
the Outlaws specific, so encompassing outlaw motorcycle

```
 1                    USA V. S. BARNES

 2   gangs.

 3              THE COURT:  You mean criminal motorcycle

 4   gangs.

 5              MR. COOPER:  Absolutely, Judge.  That is

 6   probably a better way, not to get twisted up with the

 7   language.

 8              He has been determined to be an expert

 9   involving criminal motorcycle gangs.  During the

10   conversation I had with him this weekend, I spoke

11   specifically with that expert about the letters BBT,

12   what that signifies within the organization.  And the

13   explanation that was provided to me by this expert was

14   that those letters signify an individual hand selected

15   within the organization that is known to be willing and

16   ready to undertake acts of violence on behalf of the

17   club to protect the interests of the club.

18              THE COURT:  And so what is Mr. Barnes

19   association with those letters?

20              MR. COOPER:  So, your Honor, Mr. Barnes has

21   been photographed wearing those letters on his club

22   paraphernalia.  And I believe, as well, that he has a

23   tattoo with "BBT" on his body, although I can't confirm

24   that.  If I could speak to cocounsel for a second.

25              THE COURT:  When you said "wearing those
```

```
1                    USA V. S. BARNES
2   letters," do you mean a t-shirt or a patch on a leather
3   jacket?
4                MR. COOPER:  I believe both, Judge.  And I
5   can confirm.
6                THE COURT:  I think there is a difference
7   between a t-shirt and a patch.
8                MR. COOPER:  I think with respect --
9                THE COURT:  At least my understanding is
10  that in the motorcycle lingo, if they get bestowed a
11  patch, that they actually get put -- it's like a varsity
12  letter or something like that from high school days.
13                MR. COOPER:  Yes, Judge.  And the government
14  is proffering that the defendant has been bestowed that
15  status, I guess, for lack of a better word, within the
16  organization.  I can confirm for the Court.
17                THE COURT:  Why don't you go ahead.
18                MR. COOPER:  Thanks.
19                So, your Honor, we're going to continue to
20  work today to confirm, the Court had specifically about
21  whether it's on the vest, the cut itself, and I'll get
22  back to your Honor with an answer to that question.  I
23  would indicate to your Honor that part of what was
24  seized during the execution of the warrant at the Outlaw
25  clubhouse was letters from the defendant and other
```

```
                         USA V. S. BARNES
 1
 2    members of the organization that are currently
 3    incarcerated in prisons across the country.  And those
 4    letter correspondence, this is the letters that the
 5    defendant has received, not the letters that he sent
 6    out.  Obviously, we didn't seize those.  In the letters
 7    that he received, at least one of those members
 8    corresponding with him indicated that he also was a
 9    member of the BBT, essentially responding to how Mr.
10    Barnes had identified himself in his letter.
11              THE COURT:  Do you have that letter?
12              MR. COOPER:  It's not in the binder, but the
13    government does have the letter, it's been seized.
14              THE COURT:  Do you have a date for when that
15    letter?
16              MR. COOPER:  A date from when it was sent?
17              THE COURT:  Yes.
18              MR. COOPER:  No, your Honor.  I don't know
19    it offhand.
20              THE COURT:  You made representations during
21    the detention hearing in front of Judge Schroeder that
22    Mr. Barnes was a high -- held a high-ranking position as
23    national enforcer within the Outlaws Motorcycle Club.
24    What is the basis for that statement?
25              MR. COOPER:  So, Judge, there was
```

```
 1                    USA V. S. BARNES
 2    photographs taken of Mr. Barnes wearing paraphernalia
 3    associated with the Outlaws Motorcycle Gang that had a
 4    bottom rocker.  I'm sure the Court is familiar with it,
 5    essentially the patch underneath the emblem in the
 6    center, and it represented a United States bottom rocker
 7    as opposed to what is traditionally seen as being a New
 8    York or Florida, it was a bottom rocker encompassing
 9    United States.
10                    THE COURT:  Anything other than that?
11                    MR. COOPER:  Not that I'm able to proffer to
12    the Court at this time, no.
13                    THE COURT:  Okay.  So, excuse me, I'm sorry.
14                    MR. COOPER:  Judge, just to expound on what
15    was stated a moment ago.  The agents investigating this
16    case and are familiar with the structure of this
17    organization have indicated that that bottom rocker, as
18    I indicated, carries significance with respect to the
19    defendant's position within the organization.
20                    Additionally, there was a letter from Jack
21    Rosga, who is a former national president who was
22    indicted in the Eastern District of Virginia and
23    convicted of racketeering offenses related to his
24    membership and leadership of this organization, a letter
25    was seized indicating that Mr. Rosga was excited to hang
```

```
                          USA V. S. BARNES
```

1                          USA V. S. BARNES

2    out again with Tommy O, John Ermin, and Big Scott, this

3    defendant.

4              THE COURT:  Big Scott.

5              MR. COOPER:  Big Scott, One Percenter, which

6    is how he identifies himself or how he is identified

7    within the investigation.

8              THE COURT:  Is that letter part of the

9    exhibits?

10             MR. COOPER:  No, Judge.

11             THE COURT:  That was seized from the search

12   of the clubhouse?

13             MR. COOPER:  It was seized, yes, Judge, from

14   the clubhouse.

15             THE COURT:  Okay.

16             MR. COOPER:  And, again, just showing his

17   proximity in an organization with over 1,000 members,

18   his proximity to the former national leader of that

19   organization supports the conclusion that he is closely

20   associated with leadership of the organization.

21             THE COURT:  Is there anything else that you

22   rely on to support the statement that he has this

23   high-ranking position within the organization.

24             MR. COOPER:  Judge, I think that is the

25   extent of the information that we've proffered to the

```
                          USA V. S. BARNES
```

1

2    Court and that is the extent of the information that we

3    have at this time.

4          THE COURT:  What about any other information

5    to support the statement that he is an enforcer or

6    somebody within the organization who engages in acts of

7    violence to promote the purposes of the organization.  I

8    mean, because what I hear you saying, you're relying on

9    this expert witness who could opine that BBT stands for

10   somebody who is an enforcer, right?  You're relying on

11   some photographs, we're not sure exactly what form, I

12   guess, the BBT insignia took of this defendant wearing

13   that, but we're not sure if it's a patch or a t-shirt or

14   what have you, and I think you're relying on a tattoo or

15   maybe you're not, I guess I'm unclear on that.

16         MR. COOPER:  Judge, I believe that the

17   defendant has a BBT tattoo as well.

18         THE COURT:  Do you know that?

19         MR. COOPER:  I want to make sure I'm not

20   crossing up the two different defendants in my mind,

21   Judge, so without confirming it.

22         THE COURT:  We're not sure about the tattoo?

23         MR. COOPER:  And then the letter as well

24   with which I proffered to the Court.

25         THE COURT:  The letter from the somebody who

                    USA V. S. BARNES

1   is incarcerated referencing him as a member of the BBT

2   and also from -- well, I guess, is it -- how do you

3   spell Rosga?

4           MR. COOPER:  R-o-s-g-a.

5           THE COURT:  R-o-s-g-a.

6           MR. COOPER:  And if you want the case number

7   for that prosecution in Virginia, I can give you that.

8           THE COURT:  Not particularly.  But I guess

9   you have a letter from him to either Mr. Ermin or Mr.

10  Barnes, but that supports the notion that Mr. Barnes is

11  a high-ranking official, not necessarily that he is

12  somebody who engages in violence?

13          MR. COOPER:  Correct, Judge, and leadership.

14          THE COURT:  So I want to focus on the

15  evidence that you have to support the notion that Mr.

16  Barnes is part of the Outlaw Motorcycle Club or Outlaws,

17  is it "Outlaw" or "Outlaws"?  I guess it's Outlaws.

18          MR. COOPER:  It's with an S at the end.

19          THE COURT:  Part of the Outlaws Motorcycle

20  Club engages in acts of violence, it's himself

21  identifying as a member of the BBT and others

22  identifying him or at least one other identifying him as

23  a member of the BBT.  But do you have anything in terms

24  of eye witnesses to any actual violence that he is

```
 1                    USA V. S. BARNES
 2  engaged in?
 3            MR. COOPER:  So, your Honor, over the
 4  weekend, I was made aware by Special Agent Nick
 5  Melchiorre of Homeland Security investigations of a
 6  video.  I haven't viewed the video of it myself.  I
 7  don't have possession of it, but Special Agent
 8  Melchiorre represented to me of what he observes on the
 9  video.  It's from a restaurant in the Buffalo area.  I'm
10  working to obtain the video.  But, as I mentioned, I
11  don't have it.  Yet and Special Agent Melchiorre
12  informed me that video shows, essentially, a
13  confrontation between the Outlaws Motorcycle Club and an
14  individual that is working as a cook at a local
15  restaurant, who is a member of a different motorcycle
16  club the Kingsmen.
17            THE COURT:  This must have been a while ago,
18  right?
19            MR. COOPER:  No, it was fairly recently,
20  within the last two years.
21            THE COURT:  And Special Agent Melchiorre
22  informed me in that video, while the confrontation is
23  ongoing in the restaurant, that you can observe this
24  individual, Barnes, standing by the door, blocking the
25  door to the restaurant.  To be clear, you don't see the
```

                         USA V. S. BARNES

1  defendant engaging or aiding in and act of direct

2  violence.  But what you see, consistent with his role

3  that the government has proffered, is the defendant

4  essentially guarding the door and preventing the people

5  from exiting until the Outlaws finished their business

6  there, which was telling that Kingsman not to wear

7  colors in that territory.  What leads to violence, as

8  the Court is well aware, which leads to violence over

9  and over again.

10          THE COURT:  Was it violence that occurred in

11 the restaurant or just a verbal confrontation?

12          MR. COOPER:  My understanding it was a

13 verbal confrontation, not a stabbing or assault.

14          THE COURT:  And this Agent Melchiorre, he is

15 local?  I mean, this is something you can get a copy of

16 the video?

17          MR. COOPER:  He is local, Judge, and I'm

18 working.  He has the video, I just don't have this

19 personally Melchiorre I want to be clear with the Court

20 I haven't reviewed it I'm relying on his representations

21 to me of what it obtains that is information I believe I

22 got on Saturday or Sunday.

23          M E L -- may I check?

24          THE COURT:  You can take it out, that's

```
 1                        USA V. S. BARNES
 2    fine.
 3                MR. COOPER:  M-e-l-c-h-i-o-r-r-e.
 4                And to answer the Court's inquiry from
 5    before, Mr. Barnes' vest does have a BBT patch on it and
 6    Ms. Champoux can pull that up on the screen.
 7                MR. TRIPI:  If I may.  If I may.  There are
 8    over 600 photos for the hearing last week.  We have more
 9    available to us that are marked.
10                THE COURT:  Has Mr. Cotter received them?
11                MR. COOPER:  He probably hasn't seen this
12    one, but he'll be seeing it the same time as the Court.
13                THE COURT:  I can see it.  You can blow it
14    up.  Okay.  So this is a photograph of Mr. Barnes' vest
15    that was seized from the from the clubhouse.
16                MR. COOPER:  That is correct, Judge.  You
17    can see on the left-hand side of the photograph, which
18    would be the front right side of the vest, is a vest
19    with two firearms firing, "snitches are a dying breed,"
20    and on the left-hand side -- the right hand side of the
21    photograph is a patch that indicates B.B.T.
22                THE COURT:  The "snitches are a dying breed"
23    I just can't see clearly from here.  It's right there.
24    Now I see it.  Thank you.
25                I had started out with a question about the
```

                    USA V. S. BARNES

1  
2     serious risk of obstruction of justice.  And it sounds

3     to me as though what you're saying, and I don't want to

4     misinterpret it, but what you're saying is because of

5     his role in an organization that the government believes

6     takes steps to stifle either individual's cooperating

7     with law enforcement or working with law enforcement,

8     that that means that he would present a serious risk to

9     obstruction of justice.  It's not as though you're

10    standing here telling me that you have any proof that

11    Mr. Barnes or any evidence that Mr. Barnes has actually

12    taken efforts to prevent witnesses from testifying or

13    cooperating with law enforcement.

14            MR. COOPER:  Well, Judge, I think it's maybe

15    a little bit in between the two the Court just fronted.

16    What the statute requires, is it a serious risk that the

17    person will obstruct or attempt to obstruct, not that

18    it's happened before.  First of all --

19            THE COURT:  But you have to have evidence of

20    that?

21            MR. COOPER:  Sure, Judge.  And I think what

22    I would say, in addition to the organization and what it

23    stands for as a whole and what they made clear what it

24    stands for, snitches are a dying breed.

25            THE COURT:  I'm going to tell you, the fact

```
 1                    USA V. S. BARNES
 2   that someone is a member of the Outlaws Motorcycle Club
 3   in and of itself, to me, does not equate with evidence
 4   that someone presents a serious risk to obstruct justice
 5   and you need more than that.
 6                    MR. COOPER:  Sure.  And I think we have more
 7   than that.  When we searched the clubhouse and searched
 8   Mr. Ermin's house, what was obtained was numerous cases,
 9   including an ongoing case in the Western District of New
10   York, new and old cases, which is evidence that the
11   organization is closely following cases they believe
12   they are related to.  And I can speak to that in a few
13   different ways.  First of all, I believe the Court
14   presided over the trial of the Kingsmen motorcycle club,
15   and I wasn't here, and I spoke with AUSA Tripi, who was
16   the prosecutor on the case, and it was my understanding
17   that the Outlaws Motorcycle Club.
18                    THE COURT:  I think the gentleman who sat
19   through the trial, who sat through the trial is here
20   today.  I don't know who he is or what his role is, but
21   I recognize him.
22                    MR. COOPER:  His role is watching what goes
23   on in court on behalf of the organization.
24                    THE COURT:  But, you know, equating that
25   with obstruction of justice is not necessarily a clean
```

```
 1                    USA V. S. BARNES
 2  connection.
 3            MR. COOPER:  Karen, can you pull up the
 4  photos from Brazil?
 5            I'm trying to find a specific exhibit to
 6  direct the Court to.
 7            It's going to be exhibit 1-EC and 1-ED.
 8            THE COURT:  Are they in the binder?
 9            MR. COOPER:  They are in the binder in the
10  one series.  And Mr. Tripi indicated that.
11            MR. TRIPI:  1-AC and 1-AD.
12            MR. COOPER:  1-AC, okay.
13            THE COURT:  Do you have them pulled up?  I
14  just didn't want to connect too early.
15            MR. COOPER:  So this was a photograph that
16  was seized at 41 Richmond in Lancaster, New York.
17            THE COURT:  Which photo is this?
18            MR. COOPER:  Which photo or residence?
19            THE COURT:  Which photo.
20            MR. COOPER:  1-AB is on the screen right
21  now.  You can see members wearing -- members of a
22  motorcycle club wearing cuts, patches with some blue
23  arrows pointed at certain individuals.  And if you flip
24  that over, if you were to flip that photograph over,
25  you'll see what is depicted on 1-AD, and there is a
```

```
1                    USA V. S. BARNES
2    sticky note affixed to the back of the photographs that
3    the blue arrows are supposed to be cops in the ABUTRES.
4    Again, showing, putting into practice, not just that the
5    organization talks about it, but they are actively
6    attempting to identify who they believe to be members of
7    law enforcement.
8              THE COURT:  You're talking about the
9    organization.  I guess that goes back to my point is
10   that, you need more to establish that this defendant
11   presents a serious risk of obstruction of justice than
12   the fact that he is a member of an organization that
13   engages in that type of activity.
14             MR. COOPER:  So I would represent to the
15   Court, it's the government's position, certainly, that
16   the defendant's status in the organization coupled with
17   the organization's position on that constitutes a
18   sufficient risk.
19             THE COURT:  And I think that goes back to my
20   question, it seems to me that what you're suggesting is
21   that because of the defendant's position, that the
22   government believes he has in the organization, coupled
23   with what the Outlaws Motorcycle Club does, that that,
24   in the government's mind, is sufficient evidence of a
25   serious risk of obstruction of justice.  And that is why
```

```
 1                    USA V. S. BARNES
 2  I was asking, it doesn't seem as though you have
 3  anything that you can identify for me specific to this
 4  defendant obstructing justice.
 5            MR. COOPER:  That's correct, Judge.
 6            THE COURT:  Okay.  Okay.  That is just what
 7  I wanted to clarify.
 8            MR. COOPER:  Absolutely.  And then if the
 9  Court is okay with it, I'll move on to the next topic
10  that I have.
11            THE COURT:  Sure.
12            MR. COOPER:  With respect to 3142(f)(2), a
13  serious risk that such person will flee, the government
14  represented to Judge Schroeder, and I'll represent to
15  your Honor that the nature of this organization, this
16  criminal organization, is such that it poses a serious
17  risk that the defendant will flee for a few different
18  reasons.
19            First of all, because there is clubhouses in
20  the more than half of the states of this country and in
21  countries all over the world, including Asia, East
22  Europe, West Europe, South America.  The defendant has
23  access to any of those clubhouses and the support of the
24  members of any of those clubhouses should he choose to
25  flee, so that distinguishes him significantly from the
```

```
 1                    USA V. S. BARNES
 2   vast majority of defendants who appear in front of your
 3   Honor who have significant ties to the Western District
 4   of New York and who lack significant ties to other
 5   states or to other countries.  In fact, I would submit
 6   that, at least in my eight years of being a prosecutor,
 7   I haven't encountered a defendant who has the reach that
 8   this defendant or Defendant Ermin have due to their
 9   membership in this organization.
10              And so the defendant was arrested sleeping
11   on the couch or not sleeping, was arrested coming out of
12   the clubhouse for the Outlaws in Buffalo.  He
13   represented and represented in front of Judge Schroeder
14   as well that he had been essentially living in the
15   clubhouse.  His wallet and gun were recovered on a
16   bedside table next to an area where an individual had
17   been sleeping.
18              THE COURT:  I take it you're going to go
19   through that proof?
20              MR. COOPER:  About the firearm?
21              THE COURT:  Yes.
22              MR. COOPER:  Absolutely.  What I would like
23   to proffer with respect to the flight risk at the same
24   way he was crashing on a couch.
25              THE COURT:  He was sleeping on a couch?
```

USA V. S. BARNES

1

2          MR. COOPER:  Or a bed, sleeping in a

3   clubhouse as opposed to a more traditional residence.

4          THE COURT:  Did he have a bed there?

5          MR. COOPER:  I believe so.  It has been

6   described as a sleeping area, so I don't want to specify

7   one way or the other.  He indicated that he had been

8   living there to pretrial services, whether a couch or

9   bed, the important fact is he --

10         THE COURT:  Don't say he was sleeping on a

11   couch if you don't know he was sleeping on a couch, Mr.

12   Cooper.

13         MR. COOPER:  I misspoke.  I don't intend to

14   be more specific than I can be.  I'm clarifying, I don't

15   know a couch or bed.  He was residing in a clubhouse and

16   the import of that, he has the ability to reside at any

17   other clubhouse.  He is not from Western New York or

18   from Buffalo, he came down in approximately 2021 and

19   remained here as a guy living in the clubhouse.  So that

20   access to clubhouses all over the world presents a risk

21   of flight that a normal defendant or a more common

22   defendant in this courtroom wouldn't have.

23              There is also the resources that belonging

24   to a large criminal organization like this gives an

25   individual.  Because he doesn't need to personally have

```
 1                      USA V. S. BARNES
 2   the money to flee, he has hundreds or thousands of other
 3   members who can assist him wherever he goes in fleeing.
 4             I'm having Ms. Champoux pull up a
 5   photograph.  And when it's done, I'll move on to address
 6   the Court's question about the proof related to the
 7   firearm.  This is in Government's Exhibit 9 from the
 8   prior detention hearing.  We have 9-A up on the screen
 9   right now.  This is essentially an end table.
10             Ms. Champoux just zoomed in on the Glock
11   semi-automatic pistol that is contained in some sort of
12   soft holster on the table.
13             And then if you zoom back out, Ms. Champoux.
14             I spoke with the search leader from this
15   where this firearm was recovered today and that search
16   leader indicated to me that within four or five feet of
17   this firearm was the defendant's cell phone and the
18   defendant's wallet containing his Social Security card
19   and other identification documents and other documents.
20             THE COURT:  Where was it in comparison to
21   this?
22             MR. COOPER:  If you give me one second,
23   Judge.  So the cell phone was recovered at the very top
24   of the stairs on a TV stand adjacent to the stairwell.
25   Approximately five feet from that cell phone in lain
```

```
                        USA V. S. BARNES
```

1  view on a table was the loaded Glock pistol, the

2  defendant's wallet and keys in the immediate vicinity of

3  the firearm.

4  

5          THE COURT:  Do you know where the wallet and

6  keys were?  They are not depicted this photo, are they?

7          MR. COOPER:  I don't believe so.  I was

8  informed by Special Agent Keith Bender, who participated

9  in the search at this location, that they were all

10  within four or five feet from each other.

11          THE COURT:  And where was this in comparison

12  to where it appeared that the defendant was sleeping?

13          MR. COOPER:  It's my understanding that this

14  is the same area of the clubhouse, what is depicted in

15  9-A.

16          THE COURT:  Do you have a larger picture of

17  this, though?  I mean, because this really doesn't give

18  me much of a sense as to what the area was like.

19          MR. COOPER:  I can check, Judge, give me one

20  second.

21          Judge, I just spoke with Special Agent

22  Marilyn Halliday, and she was present at the clubhouse.

23  She indicated that the room is essentially one large

24  room with a couch and an end table.  On the end table,

25  you can see the firearm.  In that same room is a bed,

1                       USA V. S. BARNES
2    looks like.
3                    THE COURT:  Looks like we might have a
4    picture up here.
5                    So the bed is behind the couch that is
6    depicted in 9-A.  In other words, the couch that is in
7    9-A, is that the same couch that is on the right-hand
8    side of the photo that is being displayed right now?
9                    MR. COOPER:  Yes, Judge.
10                   THE COURT:  So the end table is presumably
11   just off camera a little bit to the right side of the
12   picture.
13                   MR. COOPER:  That is correct, Judge.
14                   THE COURT:  Okay.
15                   MR. COOPER:  And so there were totes,
16   according to Special Agent Halliday, there were totes
17   containing the defendant's clothes in the same room,
18   which you can see is sort of a large upstairs room.  And
19   this is where the cut or the vest was recovered.
20                   THE COURT:  And where was the vest?  Was it
21   in the same area?
22                   MR. COOPER:  It looks like Karen is trying
23   to zoom in on it.
24                   THE COURT:  It's hanging, but you can't see
25   it front on in the photograph, essentially.

```
 1                      USA V. S. BARNES
 2               MR. COOPER:  That's correct, Judge.
 3               THE COURT:  Ms. Champoux, can you zoom in on
 4   the right-hand side of the picture?  Do you know what I
 5   mean?  In other words -- exactly.  Do we know what this
 6   is?  Looks like junk, but hard to make it out.
 7               AGENT HALLIDAY:  Clothing and storage
 8   setting.
 9               MR. COOPER:  My understanding from the agent
10   that was present, clothing and storage.
11               THE COURT:  Were there drugs found at the
12   clubhouse?
13               MR. COOPER:  Steroids.
14               THE COURT:  Any other drugs?
15               AGENT HALLIDAY:  Marijuana.
16               MR. COOPER:  Also marijuana, Judge.
17               THE COURT:  And the steroids, were they
18   prescribed.
19               MR. COOPER:  I can consult with the case
20   agent quickly.  Thank you.
21               Judge, I think the parties are working on a
22   housekeeping matter with respect to putting a number on
23   this exhibit because it was not numbered for Judge
24   Schroeder.
25               THE COURT:  We should put it on the vest as
```

```
 1                      USA V. S. BARNES
 2   well.
 3              MR. COOPER:  To answer the questions about
 4   the steroids, Special Agent Halliday informs me there
 5   were various vials that didn't have a prescription and
 6   needles around the vial.  There is not a prescription
 7   around the vials, but I don't want to definitively tell
 8   the Court they were not.
 9              THE COURT:  And what was the quantity, if
10   you know, of the marijuana.
11              MR. COOPER:  Not bulk distribution amounts
12   of marijuana.  There was marijuana in a jar in the bar
13   area of the clubhouse.
14              THE COURT:  Were there any drugs in this
15   living area?
16              MR. COOPER:  That is where the steroids were
17   recovered, Judge.
18              THE COURT:  And I'm looking, it's maybe just
19   hard for me to see, but on the left-hand side, I see the
20   bed, I see the tan couch, and there is some kind of
21   maroon piece, it looks like it's a piece of furniture.
22              MR. COOPER:  It looks like a love seat or
23   couch as well, Judge.
24              THE COURT:  And just to be clear, when law
25   enforcement went there, the defendant came outside the
```

```
 1                    USA V. S. BARNES
 2   clubhouse.  It's not like he was found sleeping in the
 3   bed or anything like that.
 4             MR. COOPER:  That's correct, they called him
 5   outside.
 6             THE COURT:  Were there any other what you
 7   would describe as rooms with living quarters in the
 8   clubhouse other than this one?
 9             MR. COOPER:  I would have to ask some of the
10   questions the Court has.
11             THE COURT:  That is why sometimes it makes
12   sense to actually put a live witness on who can answer
13   questions, but if you want to proffer.  You're welcome
14   to do that, but I'll give you a minute to get an answer
15   to my question.
16             MR. COOPER:  Judge, the area that we're
17   looking at is the only area that appeared to be a
18   sleeping area downstairs was a larger clubhouse
19   recreation with a bar this up stair areas is the only
20   area that the agents identified that appeared to be like
21   a sleeping quarters.
22             THE COURT:  Okay.  Go ahead, Mr. Cooper.
23             MR. COOPER:  So I referenced the list to
24   Judge Schroeder of the different areas that the Outlaws
25   maintain clubhouses as I think that pertains to the risk
```

```
 1                    USA V. S. BARNES
 2   of flight.  This is information that is listed on their
 3   publically accessible website.  It involves South
 4   America and Brazil, and then multiple chapters, as I
 5   mentioned, in more than half the states in the country.
 6   I'm not going to list every clubhouse and every state,
 7   it's in the transcript.  But what I will tell the Court
 8   as a summary is that the clubhouses accessible to the
 9   defendant include a total of at least 136 chapters in
10   the United States, 14 chapters in South America, Canada,
11   France, Germany, Thailand, the Philippines, Spain,
12   Switzerland and the Czech Republic mand that is just to
13   name a few.  There is also a chapter opened in Russia
14   which would present a particular difficulty given
15   Russia's extradition or lack thereof extradition policy
16   with the United States.  And so it's the government's
17   position that this access to clubhouses all over the
18   world and all over the country presents a unique --
19             THE COURT:  The potential penalties are up
20   to fifteen years in prison, correct?
21             MR. COOPER:  That is accurate, Judge.
22             THE COURT:  And have you done an estimate of
23   the Guideline range?
24             MR. COOPER:  Yes, Judge.  The estimate of
25   the Guideline range is in the neighborhood of 33 to 41
```

```
 1                    USA V. S. BARNES
 2   months imprisonment, so about three years give or take.
 3              THE COURT:  Do you have any -- well, I do
 4   want to interrupt you if I have a question.
 5              MR. COOPER:  It's okay.
 6              THE COURT:  Do you have any more information
 7   about the more recent criminal convictions from, I think
 8   it was an assault in 2018, he was charged -- the
 9   defendant was charged with disorderly conduct and
10   assault, both misdemeanors.  He was sentenced to good
11   behavior and no contact with the victim.  Do you have
12   any more information about the specifics of those
13   convictions?
14              MR. COOPER:  I don't have more information
15   than what is contained in the bail report, your Honor.
16              THE COURT:  Which I don't think is really
17   much, is it?
18              MR. COOPER:  It's not, your Honor.
19              THE COURT:  There is nothing about the
20   specifics, for instance, whether or not it was alleged
21   to be related to something dealing with the Outlaws
22   Motorcycle Club or was it something related to a
23   domestic violence incident, I mean, we don't know.
24              MR. COOPER:  That is accurate, Judge.  We
25   don't know.  The information that was provided by
```

```
 1                      USA V. S. BARNES
 2    probation is what the government has when a criminal
 3    history was run for the defendant, the felony conviction
 4    didn't even show up.  It took quite a bit of leg work
 5    due to the nature of that felony conviction to pull up
 6    the certified conviction, and so I don't have more
 7    details for the Court than what is contained in the
 8    Pretrial Services Report regarding the assault.
 9            THE COURT:  What about the protection orders
10    that are referenced in the bail report?  I didn't see
11    any reference to that during the hearing in front of
12    Judge Schroeder.  This is on page 3 of the bail report.
13            MR. COOPER:  I see it, your Honor.  The
14    indication here is that it was issued in September of
15    2020 and expired in September of 2021 involving two
16    individuals.  I don't want to read the names, but the
17    Court has it in front of it.  I don't have more
18    information.
19            THE COURT:  Or who those two individuals are
20    or how they are potentially related to the defendant?
21            MR. COOPER:  One bears the last name of the
22    defendant, so that is the information I have is what is
23    contained in the Pretrial Services Report.  I think
24    there is an inference that could be drawn based on the
25    common last name.
```

```
 1                         USA V. S. BARNES
 2               THE COURT:  But you don't have any?
 3               MR. COOPER:  Correct.
 4               THE COURT:  Do you have anything else?
 5               MR. COOPER:  Judge, what I would like to
 6     focus on, and I'll keep my notes contained, and because
 7     I know your Honor is familiar with the transcript before
 8     Judge Schroeder, and what I'll say, the status within
 9     the organization coupled with the organization's goal
10     related to witnesses, informants, undercover law
11     enforcement officers, indicates clearly that the
12     defendant poses a danger to the community and presents a
13     risk of obstruction of justice.
14               I would also note for the Court that --
15               THE COURT:  You haven't proffered anything
16     to me about any obstructive acts that have occurred in
17     any capacity.
18               MR. COOPER:  So the attachment for the
19     search warrant that was executed on both --
20               THE COURT:  I don't have the search
21     warrants.
22               MR. COOPER:  Okay.  I was just going to
23     proffer to you about the statutes that were cited and
24     some of the underlying -- well, the underlying statutes
25     and enumerated offenses that were contained on the
```

                    USA V. S. BARNES

1    warrants when the warrants were executed, included

2    witness tampering, obstruction of justice.  And so the

3    whole reason that those searches were conducted was to

4    search for evidence related to witness tampering.

5           When the government goes into those

6    locations, they seize court documents, FBI sensitive law

7    enforcement sensitive documents that talked about

8    statements made by cooperating individuals.

9           THE COURT:  You seized that from the

10   clubhouse?

11          MR. COOPER:  From Mr. Ermin's house.

12          THE COURT:  Let's focus on Mr. Barnes.

13          MR. COOPER:  Well, Judge, they are both

14   members of the same organization with the same goal and

15   so whether things are found in the international

16   president's house or the clubhouse where he resides or

17   the area where he resides, I would submit to the Court

18   that import is the same, which is this organization is

19   keyed in on identifying people who cooperate with law

20   enforcement and addressing that if it poses a danger to

21   the organization.  Any rank and file member of the

22   organization is tasked with, it's essentially a

23   paramilitary organization in the sense it has a

24   structure, there are rank and file members and members

```
 1                    USA V. S. BARNES
 2    in leadership; individual leadership in a particular
 3    chapter and national leadership.  The person that is in
 4    front of this Court is a person who is a member of that
 5    national leadership part of the organization and as such
 6    he is an individual that can command other members of
 7    the organization to undertake tasks that protect the
 8    Outlaws Motorcycle Club.
 9              THE COURT:  I dealt with this in the
10    Kingsmen case, and I, in fact, dealt with it several
11    times in the Kingsmen case.  And my view of the Second
12    Circuit case law is just being associated with an
13    organization, even in a leadership capacity that is,
14    arguably, a violent organization or an organization that
15    engages in criminal conduct or an organization that,
16    even let's say engages in obstructive acts, is not
17    sufficient.  You need to have something more linking the
18    particular defendant, whose liberty you're seeking to
19    take away without any finding of guilt and under a
20    presumption of innocence, you need to have something
21    more linking that individual to either directing others
22    to engage in violent acts or obstructive acts or
23    directing others to or personally engaging in that type
24    of conduct.  And my -- I've updated my research that I
25    did I don't know how many years ago at this point, I
```

USA V. S. BARNES

1
2   don't think the law has changed at all.  When you look

3   at the Second Circuit case law that deals with detention

4   determinations in a whole variety of context, but

5   dealing with criminal organizations and even leaders in

6   these criminal organizations, my view is you need to

7   have some evidence to detain the person based upon their

8   association in the organization.  You need to have

9   evidence of that individual either personally directing

10  the criminal acts or being involved in those criminal

11  acts.

12          MR. COOPER:  Judge, in this case, the

13  defendant has been charged by a Criminal Complaint with

14  possessing a firearm as a previously convicted felon.

15          THE COURT:  Right.  So focus on that.  I

16  mean, you can focus on that.  You can focus on this

17  individual's transient lifestyle.  You can focus on the

18  prior criminal record, I mean, the felony is old, but

19  there is relatively recent additional criminal acts, and

20  you can argue that.  I am just not going to be -- I

21  think you have an uphill battle to persuade me, without

22  something more, that just because somebody is part of

23  the Outlaws Motorcycle Club, even in a leadership

24  capacity, even, potentially, maybe even in a capacity

25  that is self identifies as being enforcers, I need to

```
1                    USA V. S. BARNES
2  have proof or evidence that this individual has actually
3  either directed that kind of conduct or personally
4  engaged in it.  I'm interested in seeing the video that
5  you referenced.  I want to see that --
6           MR. COOPER:  Yes, Judge.
7           THE COURT:  -- before I make a decision on
8  this.
9           MR. COOPER:  Understood.  And as I
10 mentioned, I came over the weekend and I'm working to
11 get it.  I'm sorry I don't have it for the Court today.
12           With respect to the something more, I would
13 like to pivot towards the firearm that was recovered,
14 the Glock 70 automatic, had a chamber ready to be fired
15 when it was recovered, the defendant is prohibited
16 person because he is previously convicted felon.  And
17 the possession of ammunition is a crime of violence when
18 the Court is considering whether detention is
19 appropriate and we have, well, more than possession of
20 ammunition, we have a loaded Glock firearm in the
21 immediate proximity of the defendant's identification in
22 the immediate proximity of the defendant's cut or vest.
23 And as the Court is well aware, every district judge in
24 Western New York is well aware, felons in possession of
25 firearms pose an inherent risk to the community.  I
```

USA V. S. BARNES

1

2    would couple that with the defendant's membership in the

3    organization.  And the point is well taken from the

4    Court that membership in that organization alone, even

5    leadership in that organization alone is not sufficient,

6    I've heard the Court on that.

7              What I would proffer is that all of those

8    things that we've discussed, coupled with the fact that

9    here there has been a probable cause determination by

10   the magistrate that this defendant, knowing he had

11   previously been convicted of a felony, illegally

12   possessed a firearm, does pose a significant danger to

13   the community, and it's a danger that would exist for

14   any previously convicted felon possessing a firearm.

15   But it's a danger heightened due to the defendant's

16   membership, leadership role, in a dangerous criminal

17   gang that is global, not just in the Western District of

18   New York, not just in the United States, all over the

19   place.

20             So if the Court is looking for more, the

21   loaded firearm in the defendant's area of that

22   clubhouse, the area that he controlled, and I can offer

23   you some solid proof on that being the area that the

24   defendant controlled in the clubhouse.  In addition to

25   telling pretrial services that that is where he wanted

```
 1                    USA V. S. BARNES
 2  to go back and live when he got out, he also made a
 3  statement to the officers when he came out of the
 4  clubhouse as the warrant is being executed, he indicated
 5  that he had back pain.  They told him they would treat
 6  him respectfully.  So he comes down the stairs and he
 7  interacts with those officers, and he makes a statement
 8  that his cell phone is at the top of the stairs that
 9  leads to that same area that we looked at photographs
10  of.  And his cell phone was recovered in the same spot
11  where he told officers, 4 feet away from the loaded
12  firearm.
13                    THE COURT:  Can you go back to the picture
14  of the area and show me where the cell phone was
15  recovered?
16                    MR. COOPER:  I don't know if it's in the
17  photograph.
18                    THE COURT:  At least tell me where off the
19  photograph it would be.
20                    MR. COOPER:  Sure.
21                    Ms. Champoux is pulling up the photograph.
22                    THE COURT:  You would agree with me, this is
23  not a presumption case, correct?
24                    MR. COOPER:  That is accurate, your Honor.
25                    So, Judge, the bottom left-hand corner of
```

```
 1                        USA V. S. BARNES
 2   the photograph, which is the larger photograph of the
 3   room with a beige couch on the right-hand side and
 4   maroon couch on the left-hand side, you can see the
 5   corner of the television at the bottom left-hand corner
 6   of the photograph.  The description that was provided to
 7   me by the agent who searched that clubhouse was that the
 8   cell phone was at the very stop top of the stairs on the
 9   TV stand adjacent to the stairwell.  And you can see the
10   TV on the TV stand on the bottom left-hand corner.  And
11   I don't believe that there is a photograph that we've
12   identified that specifically shows the stairwell and
13   where it relates to the rest of the bedroom.
14             THE COURT:  So you were saying that the
15   defendant when questioned by law enforcement.  There is
16   another photograph.  What was the other photograph?
17             MR. TRIPI:  There are others in the sequence
18   if we could flip through them, 107 through 110.
19             THE COURT:  The photograph that is being
20   shown right now, which we have to mark as an exhibit,
21   has a TV stand and end table with a lamp.  Is that where
22   the firearm was found?
23             MR. COOPER:  Yes, Judge.  You can see it, if
24   you want to zoom in at the base of the lamp, you can see
25   the soft case we looked at earlier, the holster just
```

```
 1                    USA V. S. BARNES
 2   behind the U.S. currency and the U.S. currency is
 3   depicted in the same close-up photograph.
 4             THE COURT:  You have some photographs in the
 5   exhibits of other items.  Are they dangerous items?  I
 6   wasn't clear on what they were.
 7             MR. COOPER:  Yes, Judge.  There are some
 8   photographs -- there was some photographs that were
 9   taken of different items with a padlock with a bandana
10   tied around it.  The point of that, it's not a weapon if
11   you're pulled over by law enforcement, it's not like
12   having a knife or firearm.  It tends to be apparently
13   innocuous.
14             THE COURT:  Were any of these in the living
15   area?
16             MR. COOPER:  When you say the living area,
17   you're referring to this upstairs area?
18             THE COURT:  Yeah, the upstairs area.
19             MR. COOPER:  I don't know.  I'd have to -- I
20   would have to look at the evidence log and get back to
21   the Court on that question.
22             THE COURT:  So, like, for instance, I'm
23   looking at exhibit 9D and exhibit 9E and exhibit 9F and
24   exhibit 9G.  I'm assuming these are all what the
25   government purports to be other items that could be used
```

```
 1                    USA V. S. BARNES
 2   to engage in acts of violence?
 3              MR. COOPER:  That's accurate, Judge.
 4              THE COURT:  What is 9E?  It's hard for me to
 5   make that out.
 6              MR. COOPER:  So, Judge, it's a 9E or F?
 7              THE COURT:  Nine E.
 8              MR. COOPER:  Nine E is daggers, fixed blade
 9   knives with ribbon on them to withdraw them from the
10   pouch.
11              THE COURT:  To what?
12              MR. COOPER:  To withdraw them from the
13   pouch, essentially, to be able to remove them from the
14   pouch.
15              THE COURT:  And 9 D looks like some kind of
16   paddle.
17              MR. COOPER:  That's correct, Judge.  And 9F,
18   similar to that bandana with the padlock on it is like a
19   cord, a lock with a metal buckle or metal fixture on one
20   end.
21              THE COURT:  And do you know, Mr. Cooper, if
22   9 D, 9 E, 9 F and 9 G were found in the living area or
23   were they found in other parts of the clubhouse?
24              MR. COOPER:  I could get that answer for
25   you.  I don't know it right now.
```

```
 1                    USA V. S. BARNES
 2              THE COURT:  Okay.  You were saying, though,
 3    I think just before we went down this road, that when
 4    the defendant was questioned by law enforcement, he
 5    denied that there were any firearms in the clubhouse.
 6              MR. COOPER:  That's correct, Judge.  And
 7    it's a statement that is entirely inconsistent with
 8    where his personal belongings, including his wallet with
 9    his identification and Social Security card, were in the
10    immediate proximity of the firearm and the firearm is
11    out in the open.  So even hypothetically assuming that
12    it wasn't his, there is no way he didn't know it was
13    there.  And yet he tells law enforcement, "not that I'm
14    aware of."  I believe the statement is, do you have --
15    are there any firearms or anything dangerous in there.
16    I think they ask about booby traps, and the defendant
17    first says, "not on me."  And then they clarify, they
18    being the agents, that they are referring to inside as
19    well.  And his statement was, "not that I'm aware of,"
20    which is obviously not true given the plain view of the
21    firearm and near his personal belongings.  And that is
22    the sort of conduct, and granted he is not required to
23    answer their questions, but from the nature of the
24    statement should give this Court concern when U.S.
25    Probation, if the defendant is released, when U.S.
```

```
                         USA V. S. BARNES
 1
 2   Probation is going to do checks and asking questions.
 3                   Additionally, Judge, I spoke with Special
 4   Agent Bender today, who is one of the agents that was
 5   present at the search of this clubhouse, and he
 6   indicated that there were plastic bottles, I think he
 7   described them as hospital urinals, I'm not sure.
 8                   THE COURT:  Hospital urinals?
 9                   MR. COOPER:  Like a plastic container to
10   store urine.
11                   THE COURT:  Like a cup?
12                   MR. COOPER:  Like a jug with a lid on it
13   that can be used for a patient that can't get out of bed
14   to urinate in them.  They were labeled or had affixed on
15   them, "clean urine."  The only reason to store clean
16   urine or to mark it as "clean urine" is if there is an
17   intent to use that to pass a drug test when you
18   otherwise --
19                   THE COURT:  Was the urine in there?
20                   MR. COOPER:  I believe there was urine in
21   one and no urine in another one.
22                   THE COURT:  Has the urine been tested.
23                   MR. COOPER:  No, Judge.  But the marking of
24   it as clean urine, again, should give this Court pause
25   in determining whether the defendant is going to follow
```

```
 1                   USA V. S. BARNES
 2  any conditions of release that were set.  We have being
 3  dishonest about whether there are weapons in the house.
 4              THE COURT:  Where were the jugs that say
 5  "clean urine" found?
 6              MR. TRIPI:  We have a photo ready for you.
 7              MR. COOPER:  Can we pull it up?
 8              THE COURT:  And all of those pill bottles
 9  around that, do we know what those are?
10              MR. COOPER:  Judge, I don't know yet what
11  those are.  There are hundreds and hundreds of items of
12  evidence that were seized with five separate search
13  warrants.
14              THE COURT:  Can we blow that up?
15              What does that say on it?
16              MR. COOPER:  The last name is Barnes, first
17  name Scott.  They appear to be prescriptions from
18  Walmart and the defendant did represent at the detention
19  hearing that he had had back surgery and was taking
20  medication as a result of that.  And the government
21  didn't proffer it to the Court that these pills were
22  illegally obtained.
23              THE COURT:  If you're citing to the urine as
24  evidence of somebody being up to no good, I would think
25  it's kind of relevant that the defendant's prescription
```

```
 1                    USA V. S. BARNES
 2  bottles are right next to it.
 3            MR. COOPER:  Sure, Judge, absolutely.  So I
 4  didn't make that connection myself, but --
 5            THE COURT:  Do you know where these were
 6  found?  Was this in the living area or in other parts of
 7  the clubhouse or do you not know?
 8            MR. COOPER:  I don't know the answer right
 9  now, Judge, but I can find out.
10            THE COURT:  You can find that out?
11            MR. COOPER:  Yes.
12            THE COURT:  What is that machine that is
13  next to that shelf there?
14            MR. COTTER:  If I may, it's a CPAP machine
15  for people that have sleep apnea.
16            MR. COOPER:  Which I believe the defendant
17  has indicated that he has sleep apnea and needs the CPAP
18  machine, so it's -- I'll leave that to Mr. Cotter.
19            THE COURT:  Okay.  So we can take that down,
20  Karen, please.  Thank you.
21            Do you have anything else?
22            MR. COOPER:  Well, Judge, I guess I'll just
23  finish the point that I started to make in summary which
24  is the Court should consider the 922(g) offense, the
25  dangerousness of the firearm in association with the
```

                         USA V. S. BARNES

1
2    other evidence, the association evidence that we've

3    spoken about as that goes under 3142 to this defendant

4    as an individual.  His membership in this organization

5    is something the Court can take into account.  I'm not

6    asking the Court to detain the defendant solely based on

7    membership in that organization, but coupled with the

8    charges contained in the Criminal Complaint, the

9    inherent dangerousness of felons who possess firearms.

10   And if I can have just one second to confer.

11                THE COURT:  Sure.

12                MR. COOPER:  So, Judge, there is one last

13   exhibit that I would like to bring to your attention and

14   that is in Government's Exhibit 11-A, and this is

15   information that is seized in the clubhouse.

16                Ms. Champoux, if we can bring up 11-A.

17                Judge, this document, it shows a variety of

18   paperwork that was seized from the clubhouse and it

19   includes confidential reports from the clubhouse.

20                THE COURT:  Can you give me more

21   information?  You say confidential source reports from

22   law enforcement, like how long ago?  Do we know what

23   case it involved?  Do we know what the source of the

24   document is?  Do you understand my question?

25                MR. COOPER:  I do understand the Court's

                    USA V. S. BARNES

1

2   question.  So it appears there is an exhibit sticker in

3   the top right corner of this one, there is a date of

4   August 29th of 1990.

5              THE COURT:  1990?

6              MR. COOPER:  That is correct, Judge.  That

7   is the date in the top right corner where it's the date

8   of investigation.

9              THE COURT:  So we're talking like almost 40

10  years ago.

11             MR. COOPER:  Thirty-three years ago.

12             THE COURT:  Okay.

13             THE COURT:  I mean, I guess, you know, I

14  don't think it's any secret that motorcycle clubs, at

15  least in my experience, monitor court proceedings.  I

16  think motorcycle clubs may argue they do this because

17  the government is intent on trying to prosecute

18  motorcycle clubs for RICO or other types of crimes.

19  And, you know, there is nothing -- these maybe are not

20  public, but documents that are public or court

21  proceedings that are public, I mean, the public, they

22  have every right to monitor, especially if it's

23  something that relates to them.  Something from 1990

24  doesn't seem as though it's particularly timely.

25             MR. COOPER:  Well, Judge, as opposed to

```
                        USA V. S. BARNES
1
2    looking at these items in isolation, I would urge the
3    Court to look at the items in the context of the
4    organization that possessing them.  Again, not to beat a
5    dead horse, an organization with mottos like "God
6    forgives and Outlaws don't" and "snitches are a dying
7    breed," I think it's clear, if you're looking at it in
8    the context of the organization who is possessing the
9    documents, why they are.  We'll note a documentation was
10   seized, which was a confidential informant report or
11   what was seized had confidential source report with
12   notations on it.  Apparently somebody trying to put
13   together who the confidential source.
14              THE COURT:  But this is from 1990?
15              MR. COOPER:  The one that we zoomed in on
16   was from 1990, there is another one from 1996 on the far
17   left side of the document.
18              THE COURT:  We wouldn't even know if Mr.
19   Barnes was involved in the Outlaws Motorcycle Club at
20   that point.
21              MR. COOPER:  Sure, Judge, but the point
22   remains the same, which is that it's a club with access
23   to members all over the country with a stated purpose of
24   snitches are a dying breed, and then you have
25   confidential source reports found in the clubhouse.  I'm
```

```
 1                    USA V. S. BARNES
 2   asking the Court to view it in the proper context based
 3   on what the Court knows about the organization and you
 4   don't have to draw any inferences there, it's how they
 5   hold themselves out, it's their own words.
 6              THE COURT:  Okay.  Anything else?
 7              MR. COOPER:  No, thank you, Judge.
 8              THE COURT:  All right.  Mr. Cotter, I mean,
 9   I can tell you right now, Mr. Cotter, I'm not going to
10   make a decision today.  So, and I know the government
11   has presented some information that is new, some
12   photographs that were new.  I want to look at this
13   video.  You can either proceed right now or we can come
14   back another time and address it.  It's up to you.
15              I mean, I'm not going to make a decision
16   today.  I do want to look at this video.  Presumably
17   you're going to want to respond to whatever is depicted
18   on the video and -- we can do it one of two ways.  You
19   can proffer something today, and I can get the
20   additional information that I've asked from the
21   government and then I could issue a written decision,
22   but that wouldn't afford you an opportunity to respond
23   to anything that the government offers after today,
24   including specifically this video.
25              MR. COTTER:  May I approach?
```

```
 1                        USA V. S. BARNES

 2              THE COURT:  Of course.

 3              MR. COTTER:  One of the first things that

 4   was going to come out of my mouth is an objection to the

 5   fact that they are layering into the record things that

 6   were not put before Judge Schroeder --

 7              THE COURT:  Doesn't matter.

 8              MR. COTTER:  -- of which I had no prior

 9   knowledge.

10              THE COURT:  You definitely need prior

11   knowledge, you need an opportunity to respond to it, and

12   you need an opportunity, if you want time to do it, I'll

13   give it, they can offer evidence that wasn't introduced

14   to Judge Schroeder in front of me.

15              MR. COTTER:  If it does not annoy the Court,

16   what I would like to propose that I do get to respond to

17   some of the proffering today and then reserve the right

18   to respond to the video when I get to see it.

19              THE COURT:  Sure.  That's fine.

20              You can have a seat, Mr. Cooper.

21              MR. COOPER:  Thank you.  I'll leave this up

22   here.

23              THE COURT:  Okay.

24              MR. COTTER:  I am a little bit confused that

25   there appear to be two docket numbers associated with
```

```
 1                    USA V. S. BARNES
 2   this case and I did electronically file and that could
 3   be because it switched from Buffalo to Rochester.  I
 4   don't know.
 5            THE COURT:  So this case is not indicted at
 6   this point, so all it has is a Criminal Complaint and
 7   that is assigned a magistrate judge number and that is
 8   assigned the 23MJ166 number.  But if there is an appeal
 9   then from a magistrate judge determination that has to
10   go to a district judge, that is when it gets assigned to
11   the MR number.  And so the MR number is what effectuates
12   getting the case assigned to a district judge.
13            MR. COTTER:  Okay.  Before we started today,
14   I asked Mr. Cooper if he had received a copy of the
15   motion the Court referenced that I filed last Thursday
16   and he had not yet seen it.
17            THE COURT:  Well, it's on the docket, I've
18   seen it.
19            MR. COTTER:  Okay.  I explained it to him.
20            THE COURT:  This was filed in the MJ case at
21   docket 4 and it is a motion for the return or release of
22   personal property and the use of a CPAP machine
23   medication.  Right?
24            MR. COTTER:  Correct.
25            THE COURT:  That is what you're referencing?
```

```
 1                    USA V. S. BARNES
 2              MR. COTTER:  Yes.
 3              THE COURT:  I have that in front of me.
 4              MR. COTTER:  One of the things that was
 5   present before Judge Schroeder was a letter, I believe
 6   undated, but I have the fax cover letter from one of Mr.
 7   Barnes' physicians who did just perform back surgery on
 8   him.
 9              THE COURT:  I haven't seen that.
10              MR. COTTER:  November the 14th.  The
11   government has a copy, if I may hand if up the Court.
12              THE COURT:  Is this a copy for me to keep?
13              MR. COTTER:  Absolutely.  I don't have an
14   exhibit tag or a sticker.
15              THE COURT:  Thank you.  Okay.
16              MR. COTTER:  All right.  And if we can stay
17   on that vein, the urinals that Mr. Cooper represented
18   that are present in the picture, we don't have a
19   designation of that exhibit up, but what I would proffer
20   back to the Court is if one has just had back surgery,
21   one has limited mobility.  And this is Mr. Barnes'
22   second back surgery in 2023.  He broke his back in March
23   of 2023 while he was in Florida.  He was involved in a
24   motorcycle accident.  He lost feeling in his legs.  Two
25   days after that accident, that is when the first surgery
```

USA V. S. BARNES

1
2  occurred in order to prevent paralysis.  He convalesced

3  for several months.  He finally went back to work

4  sometime in the fall of 2023, not at work, but a day

5  following his return to work, he fell and bent the

6  titanium rod that had been inserted into his back, which

7  is why we have the November 2023 surgery.

8          The urinals that are in the photograph that

9  was up before the Court a few moments ago are clearly

10  hospital urinals and used primarily by males in order to

11  discharge urine without having to get out of bed.  I

12  submit to you that it would make sense that if it

13  doesn't have any urine in it, it means it's been cleaned

14  out.  If it's filled with urine, like one of the ones in

15  the picture is, it's not obviously not something that

16  somebody is going to use to drink nor in a place of

17  social gathering where alcohol is served is it going to

18  be used as a receptacle for alcohol if it has the word

19  "urine" on it.

20          All right.  Briefly speaking, I don't have a

21  case cite for you because I didn't know we were going to

22  have a name of a DEA agent who has been qualified to

23  testify in God knows how many cases, but I do understand

24  that that agent --

25          THE COURT:  I think it was ATF.

```
 1                    USA V. S. BARNES
 2              MR. COTTER:  ATF, sorry.  Jeremy Sheetz was
 3   apparently disqualified as an expert witness in a case
 4   involving a gentleman with the last name of N-o-e, Noe.
 5   And all I know that it was in the District of
 6   Massachusetts, but I don't know a year and I do not have
 7   a cite for the case.
 8              THE COURT:  Can you get that?
 9              MR. COTTER:  I'd be happy to.
10              THE COURT:  Okay.
11              MR. COTTER:  I would assume I can.
12              THE COURT:  You can try.
13              MR. COTTER:  The internet and I sometimes
14   get along.
15              THE COURT:  Well, do your best.
16              MR. COTTER:  Now, Mr. Cooper made reference
17   to facts or allegations with respect to letters that
18   were in the clubhouse that certainly made a reference or
19   what he believes to be a reference to Mr. Barnes.  But
20   given that, A, we don't have the letter, we don't know
21   what was said in the letter that was sent out to
22   whomever or wherever, what the context is and we don't
23   know anything other than there is something that
24   somebody saw and I think this is what I believe the
25   Court should take from it.
```

```
 1                      USA V. S. BARNES
 2              THE COURT:  One of the letters refers to the
 3    letter writer and Mr. Barnes both being members of the
 4    BBT.  And then the other letter from this Mr. Rosga
 5    refers to Mr. Barnes and Mr. Ermin getting together with
 6    Mr. Rosga once he is released, if I understand it
 7    correctly.
 8              MR. COTTER:  Okay.  But there is an
 9    indication at least or belief by the government that
10    there was correspondence that went out of which we have
11    no knowledge what was inside the correspondence that
12    went out and we have no idea how the letter that was
13    received references back to the letter that went out.
14              THE COURT:  Mr. Cooper, can you clarify
15    where those letters were found?  Were they in the
16    clubhouse or Mr. Ermin's house?
17              MR. COOPER:  Judge, the letters we're
18    referring to are letters that were recovered in either a
19    duffle bag or backpack in the same area that we've
20    looked at with the firearm, Mr. Barnes personal
21    identification, wallet, it's up in that same area.
22              THE COURT:  And I take it you could provide
23    the Court and Mr. Cotter with copies of the letters?
24              MR. COOPER:  Not today, Judge.  I don't
25    believe they have been scanned.  We went after the
```

```
 1                    USA V. S. BARNES
 2   searches were executed.
 3            THE COURT:  I didn't say today.  You can
 4   provide me copies of the letters?
 5            MR. COOPER:  Absolutely, Judge.
 6            And just to clear up on the Noe, N-o-e,
 7   case, I can give the Court the detail regarding that
 8   case.  It's from the County of Bristol in Massachusetts.
 9   And the Court didn't allow the testimony because it was
10   deemed to be not significant because there were other
11   witnesses who had testified about the same information
12   that the expert was going to testify.  The expert
13   witness was not disqualified on the basis of a lack of
14   expertise.
15            THE COURT:  Was it a state court case or
16   federal court?
17            MR. COOPER:  State court case, Judge, the
18   Commonwealth of Massachusetts.
19            THE COURT:  You don't have a cite?
20            MR. COOPER:  No, Judge.  I'm looking at the
21   curriculum vitae and County of Bristol, Commonwealth v
22   Joseph Noe.
23            THE COURT:  Can you provide me and Mr.
24   Cotter a copy of the CV?
25            MR. COOPER:  Yes, Judge.
```

```
 1                    USA V. S. BARNES
 2              THE COURT:  Okay.  Thank you.  Go ahead, Mr.
 3    Cotter.
 4              MR. COTTER:  Now, both before Judge
 5    Schroeder and yourself, the government has provided
 6    exhibits that I believe I wrote down as 1-AC and 1-AD.
 7    These are pictures alleged or at least represented to be
 8    of individuals in Brazil with notations on the back of
 9    the photograph.  Does the Court recall that?
10              THE COURT:  Yes.
11              MR. COTTER:  We don't know who wrote
12    anything on the back of the photograph.  We don't who
13    the individuals are in the back of the photograph.  We
14    don't know who drew the blue arrows.  There is a sticky
15    note to the image to the left of the photograph, we
16    don't know who wrote on the sticky note.
17              The Court had some questions about whether
18    or not we even know whether or not Mr. Barnes was a
19    member of the motorcycle club back in 1990 or 1996, we
20    don't.  We do know, however, I do, that Mr. Barnes is a
21    member of another organization called International
22    Brotherhood of Electrical Workers, that is how he made
23    his living through his adult life.  He is now 55 years
24    old.  He came to Western New York from Eastern
25    Massachusetts, which I submit to the Court is a far more
```

```
 1                    USA V. S. BARNES
 2   expensive place to live than here.  I am aware of other
 3   members of --
 4               THE COURT:  Especially if you're living in a
 5   clubhouse, I suppose, right?
 6               MR. COTTER:  Well, Judge, if you can't work
 7   because he has had the back surgeries, it makes sense.
 8               THE COURT:  Okay.
 9               MR. COTTER:  All right.
10               THE COURT:  Are you proffering that he has
11   lived in any other location in Western New York?
12               MR. COTTER:  Yeah, he has had residences.
13               THE COURT:  Other than the clubhouse?
14               MR. COTTER:  Right.  Offhand, I don't know
15   the street addresses, but there are street addresses
16   that I do not know as I stand here.  I can turn around
17   and get them.
18               THE COURT:  Sure, if you want.  It's up to
19   you.
20               MR. COTTER:  Sure.  Just give me a second.
21               Without the glasses, it's not going to work.
22   19 Gratten Street, G-r-a-t-t-e-n, Buffalo, I didn't get
23   a zip.  But as I understand the sequence of events,
24   Judge, when his back -- when he broke his back in March
25   of '23, he was not able to work for a considerable
```

```
1                    USA V. S. BARNES

2  period of time after that and didn't have the resources.

3              THE COURT:  He was living in Western New

4  York at that time even though the accident occurred in

5  Florida?

6              MR. COTTER:  He was in Daytona Beach for

7  something called "Bike Week."

8              THE COURT:  Yes.

9              MR. COTTER:  I'm unfamiliar with.

10             THE COURT:  I am familiar with it.

11             MR. COTTER:  As I understand it, it's a

12 group of people that are all associated with motorcycles

13 that go down to Daytona Beach.

14             THE COURT:  So, in other words, he was

15 living in Western New York, went down for "Bike Week"

16 and broke his back during "Bike Week."

17             MR. COTTER:  And came back to Western New

18 York.

19             THE COURT:  Okay.

20             MR. COTTER:  I've been in touch and spoke

21 with his attorneys in Florida who are suing.  What

22 happened on the bike was a pothole, but there is an

23 active lawsuit or at least a lawyer's investigation.

24 That last name of the lawyer who runs the firm is

25 Keller.  Keller is originally from Buffalo, relocated to
```

USA V. S. BARNES

Florida.  And I spoke with somebody in his law firm and
they are aware of Scott and aware of his situation, not
necessarily in custody today, but that he is a Plaintiff
or will be a Plaintiff in a negligence case involving
whomever owns the street.  I don't want to say State of
Florida, whatever municipality it is.  My understanding
is that Mr. Barnes moved from Eastern Massachusetts to
Western New York sometime in 2022, I don't have the
month.

Before Judge Schroeder was proffered it was
shortly after a case involving a guy named Gerace or
Gerace, which I believe bears a 2019 docket number.  The
indication or at least proffered to Judge Schroeder was
that Mr. Barnes arrived in Western New York shortly
after the Gerace indictment dropped in 2019.  And that
he is the national enforcer, et cetera.  Part of me
thinks that is hokum because one --

THE COURT:  I'm not familiar with that word.

MR. COTTER:  I was going to say "bunk."

THE COURT:  I'm familiar with that word.

MR. COTTER:  Okay.  All right.  If in fact
Mr. Barnes or if this indictment, because that is really
what the government hasn't said to you today, but that
is all they said to Judge Schroeder, is that because of

                    USA V. S. BARNES

1
2    this Gerace and Bongiovanni case, they are worried that
3    witnesses are going to be intimidated.  They see a huge
4    correlation between Mr. Barnes and this other case in
5    Buffalo.  But if the government's proffer to Judge
6    Schroeder is correct and Mr. Barnes came here in 2019,
7    where is the evidence that he is obstructing anyone.
8    Where is the evidence that he has done anything.
9             You're on the bench, I'm a defense lawyer.
10   We've all seen how the government puts together their
11   cases.  We have wiretaps, video and pole cameras.  And
12   we have more evidence -- we have phones -- than I have
13   ever wanted to see.  As a defense lawyer, that is the
14   standard case that the federal government brings against
15   an individual.  The United States against Scott Barnes,
16   we have innuendo.  We have association and we have
17   nothing more.
18             In the Criminal Complaint, Judge, it says
19   that the clubhouse was under surveillance from, I
20   believe, November 6th until the arrest on December 7th.
21   All right.  The Criminal Complaint is completely devoid
22   of any factual allegations of any illegal activity
23   undertaken by Mr. Barnes in that 30-day period of time.
24   There is no obstruction, there is no flight, there is no
25   anything.  All right.  Normally we would expect that

```
                        USA V. S. BARNES
```

1                           USA V. S. BARNES

2      they would have that kind of evidence.  It isn't here.

3      It is a guilt by association case on this aspect.  On

4      the detention thing, I submit it's fundamentally unfair

5      and almost to the point of cruel to try and keep this

6      guy locked up when what he really needs is medical

7      attention and physical therapy.

8                 He doesn't have the financial means to go

9      anywhere.  He doesn't have a passport.  He does have an

10     enhanced license, which is more than happy to surrender.

11     Without those exit documents, he can't really get out of

12     the country.  He can't board a plane, he can't, you

13     know, drive through Mexico and get through Guatemala or

14     whatever to get to Brazil; it's just not possible.  He

15     can't fly to any of the clubhouses overseas, whether

16     they are in Asia or Europe or Western Europe or Eastern

17     Europe.  Those funds don't exist.  The prospect of risk

18     of flight, it's nonsense.  All right.  And in terms

19     of --

20                 THE COURT:  You had indicated in front of

21     Judge Schroeder, and, I think, you know, probation's

22     recommendation for release is conditioned upon him

23     residing in an acceptable location.  And is there a

24     proposed acceptable location?

25                 MR. COTTER:  We don't know that answer yet.

```
                          USA V. S. BARNES
 1
 2    And the folks here from pretrial services are not the --
 3    and I don't have my file in front of me.  I know his
 4    name is Antone, but that is the first name, pretrial
 5    services officer who is in Buffalo.  I have provided
 6    that gentleman with a proposed address.
 7                THE COURT:  Oh, you did.
 8                MR. COTTER:  And the individual standing
 9    behind me that you indicated you're familiar with from
10    another case that you had, that is the individual that
11    owns the house.  He is here to talk to anybody who wants
12    to talk to him about the residence.
13                THE COURT:  Okay.
14                MR. COTTER:  To my knowledge, he has not yet
15    been contact by pretrial services.  They have not gone
16    into the residence to see whether or not --
17                THE COURT:  Do we have a name of who owns
18    it?
19                MR. COTTER:  It's in my file.  And what I
20    can tell you is the last name has more vowels in it than
21    consonants and it's dramatic.  But I don't want to
22    offend anybody by trying to pronounce it.  I believe
23    it's Gary, it's Elsaesser.  It's Keith, I'm sorry.  And
24    I'll pronounce it as Elsaesser.  I spelled it
25    E-l-s-a-e-s-s-e-r.
```

```
  1                        USA V. S. BARNES
  2               THE COURT:  Okay.
  3               MR. COTTER:  Street address proposed to
  4     pretrial was 39 Peoria Street, Buffalo, New York, zip
  5     14207, lower unit.
  6               THE COURT:  You've got your gentleman in the
  7     back is trying to signal to you.
  8               MR. COTTER:  He says 37, I may have
  9     misspoke.
 10               THE COURT:  You said 39.
 11               MR. COTTER:  Thirty-seven.
 12               Then somebody should treat my handwriting
 13     how to be more visible.  I had 37 written in front of me
 14     and if I misspoke I'm not trying to send anybody to the
 15     house next door.
 16               THE COURT:  Fair enough.
 17               MR. COTTER:  All right.  Also, Judge, in
 18     terms of this proximity argument, and I don't have the
 19     benefit, but the picture was up that shows the couches
 20     and the TV, and you can see in the far side of the room
 21     there are beds that are on the other sides of the
 22     couches.
 23               THE COURT:  Are there beds or just one bed?
 24     Looked to me like one bed.
 25               MR. COTTER:  As I understand it, Judge,
```

```
1                    USA V. S. BARNES
2    between those large black totes with.  I believe, yellow
3    tops, on the far side between the window and those totes
4    is a bed.
5              THE COURT:  That you can't see in the
6    photograph.
7              MR. COTTER:  You can see the foot of it.
8              THE COURT:  Oh, okay.
9              MR. COTTER:  I assume the foot, might be the
10   head.
11             THE COURT:  Okay.
12             MR. COTTER:  But that is the far side of the
13   room.  And I believe that as you look down that room
14   with that bed on the lower far left-hand corner, on the
15   far right-hand side of the wall, are those plastic
16   shelving units that contain Mr. Barnes' legally
17   prescribed pain medication.
18             THE COURT:  Could we pull the photograph up?
19   It's easier for me to follow what you're saying as we're
20   looking at it.
21             MR. COOPER:  We're going to work on getting
22   that up for you, Judge.  If you just give us one second.
23             MR. COTTER:  In order to look, because we
24   don't get there.
25             THE COURT:  Go over there, that's fine.
```

```
 1                        USA V. S. BARNES
 2               MR. COOPER:  One second.
 3               MR. COTTER:  I'm mistaken, the plastic
 4     shelving units, at least from what I can gather, do not
 5     appear to be --
 6               THE COURT:  Ms. Champoux, can you blow that
 7     up?
 8               So is your point that in the back there
 9     where the little cursor is on, that that is another bed.
10               MR. COTTER:  That is what my understanding
11     is.  If you see the four outlet wall sconce with one
12     plug in it, I believe that that described material where
13     the hand image is now that that is a bed and that is a
14     bed.  And if I can check one point.
15               THE COURT:  Sure.
16               MR. COTTER:  If we can zoom in a little bit,
17     Judge, to the left of the window.  And we can stop
18     there.
19               The shelving unit that I referenced that had
20     the urine in it, that had the prescription medication in
21     it, that had the CPAP machine in it, that is all in that
22     shelving unit right between the bed and the wall.
23               THE COURT:  Okay.
24               MR. COTTER:  Where the gun is found is the
25     far end of the room at the top of the stairs.  They keep
```

```
 1                    USA V. S. BARNES

 2    saying in close proximity.

 3              THE COURT:  Well, I think what the argument

 4    is it was in close proximity to where the cell phone

 5    that your client identified with was located.  If that

 6    was located on the TV stand, that is more -- can you

 7    zoom out?  Thank you.

 8              That is more on the forefront of the room.

 9              MR. COTTER:  And as I understand it, Judge,

10    as agents entered the property, Mr. Barnes started to

11    exit.  They communicated.  He was asked if he had

12    anything in his hands, he said "I have a phone."  They

13    told him to put it down and that is where he put it

14    down.

15              THE COURT:  Okay.

16              MR. COTTER:  All right.  What is missing

17    from the gun, Judge, again, a federal government,

18    criminal prosecution, do we have any fingerprints?

19              THE COURT:  They are not going to have that

20    at this point.

21              MR. COTTER:  Do we have any DNA?  We don't.

22              We also know from the presentation they gave

23    Judge Schroeder there was a lot of guns in this other

24    guy's house.  This is a clubhouse that has more than one

25    member.  Is Barnes staying there while convalescing.
```

USA V. S. BARNES

1

2  Barnes is staying there while convalescing.  Is he

3  responsible for everything in there?  Not necessarily.

4          THE COURT:  And I think that is certainly a

5  fair argument with respect to the rest of the clubhouse,

6  but this appears to be one living area, and I think the

7  government's best argument, quite frankly, is that there

8  was a loaded glock found in the living area where your

9  client was clearly residing, and your client could not

10  lawfully possess a firearm.  That is why they brought

11  charges based on that charge.  They haven't, at this

12  point, filed charges related to activity in connection

13  with the Outlaws Motorcycle Club.

14          MR. COTTER:  Not that I'm aware.  But I know

15  the Court queried of Mr. Cooper whether or not this is a

16  presumption case.  And I submit, in part, it is,

17  particularly at this detention, that he is presumed

18  innocent and he is also entitled to a reasonable bail.

19  And I think that the proposals or the ruling that Judge

20  Schroeder made was certainly both.  He will appear in

21  court as directed and required.  He is not a risk of

22  flight, and he is not a danger to anybody.  And if it's

23  okay with the Court, what I would like to do is reserve

24  any further argument until after we see the video.  And

25  I don't know if you want to do it in person or if you

```
                        USA V. S. BARNES
1

2   want to do it on paper.

3              THE COURT:  You tell me, and we can play it

4   by ear.  I guess the question I have for the government

5   is how long, how quickly can you get me the video?  I'd

6   like the CV, the video, copies of the letters that were

7   referenced, and I would also like you to mark the other

8   photographs that we looked at here in court today and

9   provide copies to both me and Mr. Cotter.

10             MR. COOPER:  Yes, Judge.  The CV I will be

11  able to e-mail it today, and I have it in the e-mail

12  account.  The letters I would ask for the end of the

13  week so we can go back to FBI and get them copied.  I

14  don't believe they have been scanned or copied, and I

15  have the original.  It will take a couple of days for us

16  to get that and get it scanned and get it over.  And to

17  be clear, a copy of the letter or letters, I believe,

18  two letters that we referenced in court today.  Not the

19  dozens of letters that were seized, just the pertinent

20  ones.

21             THE COURT:  Right.  The ones you referenced

22  in court.  I think two letters.  One referring to the

23  BTT and one referring to the or the BBT, and one

24  referring to the letter from Mr. Rosga.

25             MR. COOPER:  That's correct, Judge.  And
```

```
 1                    USA V. S. BARNES
 2    those two, I'll get and send them to Mr. Cotter and the
 3    Court.  And then the video, I'll work with Special Agent
 4    Melchiorre to obtain a copy of it and I'll work to do
 5    that this week as well and get it over to the Court and
 6    Mr. Cotter.
 7              THE COURT:  And so you tell me, Mr. Cotter,
 8    if the government gets us that material by the end of
 9    this week, do you want to respond in writing or would
10    you prefer to have another in-person appearance?  Video
11    is tough to respond to in writing, quite frankly,
12    because, you know, it's easier to discuss a video if
13    you're looking at it being displayed.
14              MR. COTTER:  Judge, that is a well taken
15    point.  And I don't know how to respond to the Court's
16    question.  I don't know that an appearance will be
17    necessary.  I don't know if further argument will be
18    necessary until I see it.
19              How about if we say we'll do it in person
20    unless there is an indication that it's deemed not
21    necessary.
22              THE COURT:  Okay.  Why don't we do this?
23    Let's set another appearance date, okay?  And if, upon
24    receiving the additional information from the government
25    you decide, Mr. Cotter, that you can just respond in
```

```
 1                     USA V. S. BARNES
 2  writing, and there is not a need for an additional
 3  appearance, just tell me that and we can arrange for
 4  that, and then I'll issue a written decision, or if we
 5  have a further in-person appearance, I may rule from the
 6  bench at that point.  Okay?
 7                  MR. COTTER:  Yes.
 8                  MR. COOPER:  Your Honor, before we schedule
 9  something, may I just respond to one point about that 19
10  Gratten address that was discussed while Mr. Cotter --
11                  THE COURT:  Yes.
12                  MR. COOPER:  So that 19 Gratten address was
13  in 2021, the same year that the defendant represents
14  that he was living there, was searched because another
15  Outlaw --
16                  THE COURT:  I don't know has he represented
17  that he was living there in 2021.
18                  MR. COTTER:  No.
19                  THE COURT:  The representation was that he
20  moved here in 2022.
21                  MR. COOPER:  Okay.  Well, the residence that
22  he represented that he was living in before the
23  clubhouse, that 19 Gratten address was searched in March
24  of 2021.  It's the residence of another member of the
25  Outlaws, PJ Raslawski, and firearms were seized from the
```

                         USA V. S. BARNES

1

2    residence at that time.  So to the extent that he

3    resided there previously, I thought it was pertinent

4    information for the Court to know.

5              Secondly, when the government proffered to

6    Magistrate Judge Schroeder that the defendant came here

7    around the same time as the Gerace indictment, that

8    wasn't the 2019 Bongiovanni indictment, it was in

9    reference to the 2021 Gerace indictment.

10             THE COURT:  When in 2021 was that?

11             MR. COOPER:  Judge, I believe that there is

12   a photograph of the defendant --

13             THE COURT:  No.  When was the indictment

14   against Mr. Gerace returned?

15             MR. TRIPI:  May I just answer?  The

16   indictment was returned February 28th, 2021.  Mr.

17   Gerace, I believe, was arrested in Florida on or about

18   March 5th, 2021 is when it became public.

19             THE COURT:  So, in other words, Mr. Gerace

20   was not charged in that case until 2021?

21             MR. TRIPI:  That is correct.

22             THE COURT:  Okay.

23             MR. COOPER:  Sorry.  I just wanted to clear

24   up that point as well.  And then if we're going to have

25   a decisional in-person appearance, I'll get these videos

```
 1                      USA V. S. BARNES
 2    and letters and the curriculum vitae over to everybody
 3    as quickly as possible and we'll be prepared.
 4              THE COURT:  And I'm going to set another
 5    date for an in-person appearance.  Once the information
 6    is produced, if Mr. Cotter doesn't feel the need for an
 7    in-person appearance, let me know that.  If the
 8    government feels otherwise and has something else you
 9    want to argue, then tell me that and we'll -- you'd have
10    to both agree that we're not going to do an in-person
11    appearance in order for it to be put off.
12              MR. COOPER:  Okay.  If we're keeping it
13    open, I'll stay in contact with Mr. Cotter and we'll let
14    the Court know what our position is as well.
15              THE COURT:  Okay.  So what is your schedule
16    like next week?  It would be here in Rochester.  I can
17    tell you I'm in Buffalo, but not until January 8th, and
18    I'm assuming you don't want to wait that long.
19              MR. COTTER:  I do not.  With the exception
20    of the evening of the 26th, I've got dinner plans, other
21    than that, I'm wide open.
22              THE COURT:  Mr. Cooper?
23              MR. COOPER:  The Court is looking at next
24    week, correct?
25              THE COURT:  Mm-hmm.
```

```
 1                    USA V. S. BARNES
 2              MR. COOPER:  Judge, I'll be here any day
 3    next week that you need me to be here except Monday.
 4    I'll be in trouble if I come here Monday.
 5              THE COURT:  The Court is closed Monday.
 6              MR. COOPER:  Good.
 7              THE COURT:  We do shut down for Christmas.
 8    What about the 27th, that is a Wednesday?
 9              MR. COTTER:  I do live about 50 miles west
10    of Buffalo.
11              THE COURT:  Do you really?
12              MR. COTTER:  I do.
13              THE COURT:  Sorry about that.
14              MR. COTTER:  So am I.
15              THE COURT:  Well, I've made enough trips to
16    Buffalo over my tenure that I don't feel too bad about
17    it, but what time would you prefer?
18              MR. COTTER:  If you can give me 10 o'clock
19    or after.
20              THE COURT:  Why don't we say 11 a.m. on
21    Wednesday, December 27th.  The government will get this
22    additional information to everybody, I'd prefer it by
23    the end of the day on Thursday, if possible.  The Courts
24    are closed on Friday, so end of the day Thursday.  But
25    if you run into an issue, let me know and let Mr. Cotter
```

```
 1                    USA V. S. BARNES
 2   know and we'll see what we can do.  Okay?
 3              MR. COOPER:  Understood, Judge.
 4              And with respect to the video -- the other
 5   things will be easy to send via e-mail.  With respect to
 6   the video, I've had trouble in the -- I'll work to get a
 7   hard copy delivered to the Court and I'll make a hard
 8   copy available at my office for Mr. Cotter.
 9              THE COURT:  Sometimes your office will
10   arrange for your office here to have it and deliver it
11   to me.
12              MR. COOPER:  It's a great idea, I'll do
13   that, Judge.
14              THE COURT:  But for Mr. Cotter, work with
15   him to be able to have him take a look at it.
16              MR. COOPER:  We'll figure it out for sure.
17              THE COURT:  And as I said, I'll reserve
18   decision at this point.
19              Anything else, Mr. Cotter?
20              MR. COTTER:  Not at this time.
21              THE COURT:  Mr. Cooper?
22              MR. COOPER:  No, thank you, Judge.
23              THE COURT:  And anything from probation?
24              PROBATION:  Yes, Judge.  As part of the
25   original bail report, it does indicate in there that the
```

```
1                          USA V. S. BARNES
2    defendant find suitable housing prior to his release.
3    We'll do a quick investigation on the proposed address
4    to the Court as well as meet with Mr. Elsaesser briefly
5    after to get more information regarding his contact
6    info.
7                    THE COURT:  Thank you, Officer Zeller.
8                    MR. COTTER:  And if I could clarify, the
9    probation pretrial services is Andre McCray.
10                   THE COURT:  Yes.  But it looks like you're
11   looking into this now.
12                   PROBATION:  Yes, Judge.  We will contact
13   Buffalo office.
14                   THE COURT:  They talk to each other
15   sometimes.
16                   PROBATION:  Very good, thank you.
17                   THE COURT:  Thank you, everybody.
18                   MR. COTTER:  Thank you, Judge.
19                   MR. TRIPI:  May I ask a housekeeping matter.
20   There is a third defendant who is charged in a separate
21   complaint, but he was part of the same series of search
22   warrants.  We filed for a stay, should that be related
23   to your Honor or?
24                   THE COURT:  Well, have you already filed it?
25                   MR. TRIPI:  I don't believe we filed and
```

1

2  prepared the stay and it was granted for 24-hours

3  earlier today until tomorrow.

4          THE COURT:  I would just use your normal

5  procedures and the Court will handle it however we

6  decide.

7          MR. TRIPI:  Okay, thank you.

8                  *     *     *

9              CERTIFICATE OF REPORTER

10

11    I certify that the foregoing is a correct transcript

12  of the record of proceedings in the above-entitled

13  matter.

14

15  S/ Karen J. Clark,  RPR

16
   Official Court Reporter
17

18

19

20

21

22

23

24

25